Swan, District Judge.
This is a motion for an injunction to restrain the defendants from the selling and offering for sale seythe stones under certain names and labels which are claimed by plaintiff as trade-marks. The plaintiff is a corporation organized in 1886 under the laws of Ohio, and since that date has been, and still is, engaged in the manufacture of seythe stones, whetstones, and grindstones. Its quarries and factories .are situate at and near Grindstone City, Mich. Upon its organization in 1886 it purchased the quarries, factories, and plant at Grindstone '«City, and the good will of Worthington & Sons, who had carried on business there for 15 years, or more. On the 23d of January, 1890, plaintiff bought the quarries, plant, business, good will, and entire property of the Lake Huron Stone Company, at Grindstone City, where the latter company had been quarrying and manufacturing grind and scythe stones since 1869. The Lake Huron Stone Company and Worthington & Sons, up to the time of said sales to complainant, had for *432 many years made, among other brands of scythe and whet stones, the “Diamond,” “Western Red Ends,” “Quinnebog,” “Star,” “Clear Grit,” and “Lake Huron,” and others, which had taken well with the trade, and were widely known as the product of the Grindstone City quarries, which stood well in the esteem of the western trade. For some years plaintiff’s vendors, the Lake Huron Stone Company and Worthington & Sons, had by agreement made and sold certain styles of scythe and whet stones under the same trade-mark or designation, except that the labels of each firm, which were in all other respects fac similes, truly stated the name of the manufacturer; as, for example, Worthington & Sons made and sold scythe and whet .stones under the name “Quinnebog,” but labeled as the manufacture of Worthington & Sons, instead of “Lake Huron Stone Co.,” which was the originator and owner of that trade-mark. ■ In like manner, the Lake Huron Stone Company labeled as “Western Red Ends” certain patterns of their manufacturers, similar in size, form, and appearance to those of that name made by Worthington & Sons, designating themselves on the labels (which were otherwise identical) as the makers, instead of Worthington & Sons. It also appears that in 1870 these two firms formed a pool or association at Chicago, 111., to supply the western markets, under the name of the “Western Grindstone Company.” This association continued until 1886, when plaintiff, as stated, bought out Worthington & Sons. The Western Grindstone Company had its warehouses at Chicago, and there received the products of the quarries of its two constituent firms, and filled the orders of its customers equally from the stones supplied by each, and used as trade names on the scythe and whet stones the words “Star,” “Clear Grit,” “Lake Huron,” “Quinnebog,” and other marks or names peculiar to each subordinate concern, or common to both, though for a time varying the form and color of the labels from those employed by the makers. Later in its history the Western Grindstone Company adopted labels on these various styles and patterns, designating either Worthington & Sons or the Lake Huron Stone Company as makers, in addition to its own name. In January, 1883, the Lake Huron Stone Company, Worthington & Sons, J. J. McDermott .& Co., of Ohio, and the Berea Stone Company, of Ohio, united to form a pool under the name of the Berea & Huron Stone Company, and under that name catalogued and offered for sale the various brands and patterns of scythe and whet stones claimed in the bill to be the trade-marks, brands, and patterns of- complainant. This pool continued until 1886, when it was dissolved by the sale by Worthington & Sons to complainant. The affidavits also show that Cooper, Grevey & Co., the predecessors in business of Worthington & Sons, had, in 1870, made and sold scythestones of like patterns under similiar label^'and of the same names with these made by the Lake Huron Stone Company, without objection by the latter. Since 1886, however, no person, firm, or corporation other than complainant and the Lake Huron Stone Company claimed, used, or-simulated the labels, names, or trade-marks here in *433 controversy, and this is admitted hy the answer. They preserved the general style and appearance of the label now in use by plaintiff, including the names applied to their various patterns of scythe and whet stones, and those names and labels, thus applied, have been known and associated to the trade for many years.
There was at one time a stone known to the eastern trade as “Quinnebaug,” made from a Connecticut quarry, which was exhausted some 80 years. The name consequently fell into disuse, and at the time of its adoption by the Lake Huron Stone Company, in 1869 or 1870, there had not been for many years a stone known to the trade by that name, though some four or five years later brands known as “ Premium Quinnebaug,” and “Extra Quinnebaug,” made from stone of obviously different character, formation, and color, were introduced into the eastern markets. The eastern “Quinnebaug” referred to were also marked by labels bearing no resemblance to those used by plaintiff and its predecessors. So far as appears from the affidavits read on the hearing of this-motion, the Lake Huron Stone Company, and the Cleveland Stone Company, as the vendee of Worthington & Sons, have used the names'“Quinnebog,” “Star,” “Diamond,” “Clear Grit,” “Lake Huron,” and “Western Red Ends” without interference by competitors in business, certainly since 1886, and the first-named company and Worthington & Sons were the only claimants of those trade-marks and labels for 15 years before that date.
The affidavit of Robert Wallace, submitted by defendants, clearly shows that the Lake Huron Stone Company made the “Star,” “Clear Grit,” and “Lake Huron,” “Quinnebog,” “Tiger Crown,” and “Harvest Queen” brands from 1868 to 1890, and for nearly as long a time the “Western Red Ends,” though he disparages the exclusive right of that company to the names and labels as trade-marks, and denies that it ever claimed such right, or objected to their appropriation by others. The force of this denial is greatly impaired by the fact that the affiant is the father of the defendants; and, though he was a member of the partnership known as the Lake Huron Stone Company from the year 1868, and joined in the sale of its quarries, business, good will, and property to the plaintiff in January, 1890, and therefore much should be conceded to his means of knowledge, the fact that he now appears to depreciate his grant-, when he covenanted with the plaintiff, as one of the conditions of the sale, not to engage in the business in that vicinity for 20 years, militates most strongly against the credibility of his denials. His relationship to the defendants, and the tenor of his statements, are more persuasive that, while he nominally observes his covenant, and has not personally engaged in the business from which he agreed to abstain, his interest now lies in the direction of detracting from the value of the property which he sold, and for which he received his share of the purchase money.
The formation of the Huron Grindstone Company, under which name defendants are carrying on business and offering to the trade the various-brands and patterns of scythe and whet stones under the same names, *434 and labeled in identically the same way, (excepting only the substitution of the name “Huron Grindstone Co.” for “Cleveland Stone Co.,”) followed too closely on the heels of the sale by the Lake Huron Stone Company to plaintiff to entitle this affidavit to be regarded with favor, even if the facts were doubtful. The proof is undeniable that since the defendants have associated themselves in their present business they have aimed directly at the trade and customers of the plaintiff by the use of almost exact counterparts of its trade-mark, and thus sought to reap the fruits of the enterprise and outlay made by plaintiff and its predecessors. While fair and open competition is entirely proper, and of public benefit, it is not permitted to a tradesman or manufacturer to appropriate the labels, brands, and names adopted by his rivals, nor to announce-to the trade his ability and readiness to supply the latter’s customers’ with the very article, under the same name and label for which the energy and means of the owner of the trade-mark have made a market. Neither is it permitted that he should so closely simulate the brands and labels of his neighbor that the public should be misled into purchasing his goods in the belief that they are the product or manufacture of those who introduced and gave them reputation. The circular to the trade issued by defendants at the formation of their partnership announced that they were prepared to fill all orders for grindstone and scythestones, (indicating the well-known brands “Quinnebog,” “Star,” “Clear Grit,” “Western Red Ends.”) Not content with this, they have simulated the style, design, color, and exact phraseology of the printed matter of the labels used by plaintiff to designate those patterns, excepting only the manufacturer’s name, for which they have substituted their own, “Huron Grindstone Company.” The affidavits leave no doubt that by these means, and by cutting the plaintiff's prices on these wares, the defendants have made large inroads upon the business built up by plaintiff, and have, and still are, doing plaintiff great injury. So closely, indeed, have the defendants imitated the patterns of plaintiff, its packages, and the style and finish of its products, that Robert Wallace, in his affidavit (made alio intuitu, indeed, but for that reason most significant) says that, “if a box of scythestones of any such names should be brought to the city of Detroit without having upon it the name of the person by whom it was manufactured, and submitted to persons in the trade who were familiar with said scythestones, such person would be unable to tell whether the same was manufactured by the Cleveland Stone Company •or by the defendants in this case.” If we add to these features of re•semblance between the products themselves the almost exact duplication •of the labels, the likelihood of the public being deceived in the purchase of defendants’ goods is almost a certainty, and may well be inferred as a corrolary from the facts, even if the affidavits did not expressly ■establish the injurious effects of such competition.
1. The first point urged for the defense is that plaintiff has failed to •show an exclusive right in the use of these names and labels as trademarks; but the fact that the Lake Huron Stone Company and Worthington & Sons, up to 1885, used them in common, and made and sold *435 the patterns of scythestones involved in this suit, and that from 1876 to 1885 those firms, under the name of the Western Grindstone Company, sold their manufactures under similar labels, and put up in like packages, and during the year 1885 united with others to form the Berea & Huron Stone Company, which also offered and sold scythestones of like patterns and under like labels with those theretofore used by the Lake Huron Stone Company and Worthington & Sons, deny to brands and labels thus indiscriminately used the protection of a court of equity.
It is true that the owner of a trade-mark cannot permit its use by others to such a degree that it will lose its original significance to the public as an index and assurance of the origin, qualities, and characteristics of the article to which it is attached, and still ask the aid of the courts to prevent its use by others without the owner’s consent. He should be regarded as having renounced whatever of profit and reputation the trade-mark had won for him, and as having consented to foist upon the public a spurious substitute for that to which he had given repute, and as having disclaimed his original exclusive right. There is, however, no occasion for the application of that doctrine to the plaintiff in this case. Whatever objections might have been raised to the relief here sought were the Lake Huron Company or Worthington & Sons asking preventive aid against the use of their trade-marks by Cooper, Grevey & Co. or other unlicensed appropriators, it is clear that the transactions relied on as depriving plaintiff of protection do not affect it. Those transactions are too remote in time, and their demerit, if any, is not imputable to the plaintiff. From 1885 to 1890—a period of five years before the defendant entered into this business—plaintiff and the Lake Huron Stone Company alone employed the trade-marks and labels and made the patterns of the scythestones which the defendant is now offering to the trade. Since plaintiff’s purchase of the Lake Huron Stone Company’s property, quarries, and good will in January, 1890, and up to the time defendants began manufacturing and selling, no person or corporation has assumed to make or vend scythestones of its patterns, or questioned its exclusive right to use the labels and trade-marks in controversy to identify its wares to the public. Since its organization, plaintiff has, in co-operation with the Lake Huron Stone Company, and latterly alone, at great expense, and by advertising and other legitimate methods, built up a large and lucrative trade, and has by its enterprise established a reputation for its manufactures which gives them a ready sale to the trade. To permit defendants to purloin the fruits of their enterprise and investments, and encroach upon their business, either on the pretext that plaintiff’s predecessors in the business had years ago submitted to a like injury without complaint, or on the plea that at one time the trade-mark had been enjoyed by others than its originator, would be a denial of justice. While it is commonly said that to entitle the owner of a trade-mark to protection against infringers his right to its use must be exclusive, it is not meant thereby that no other than the originator has rightfully empered it. Such a right is property transferable and descendible, and may be the subject of ownership by two or *436 more, without impairing the claim of its owners to redress for its unlawful use by others. New York Cement Co. v. Coplay Cement Co., 45 Fed. Rep. 212; Kidd v. Johnson, 100 U. S. 617; Chemical Co. v. Meyer, 139 U. S. 540, 547, 11 Sup. Ct. Rep. 625; Burton v. Stratton, 12 Fed. Rep. 696, 704. The right to protection for such property is founded on two considerations: (1) That the owner, by its adoption and use, has acquired a property which to him is valuable; (2) that the use of the symbol or device in such a manner as to mislead the public as to the origin of the article is a fraud alike upon the purchaser and the proprietor whose trade-mark is simulated, his sales thereby lessened, and his reputation perhaps discredited by the inferiority of the article substituted for his manufacture. No definite length of time is requisite to confer this right of property, provided the injured party has, by priority of adoption, appropriated the name or symbol as peculiar to his merchandise, and indicative of its place of manufacture. He meets this requirement even if he selects a name or symbol the use of which had been abandoned by others when he employed it. O’Rourke v. Soap Co., 26 Fed. Rep. 576-578.
Whether, by their co-operation at Chicago under the name of the Western Grindstone Company, or their subsequent association with Mc-Dermott & Co. and the Berea Stone Company, the Lake Huron Stone Company and Worthington & Sons became partners, it is unnecessary to decide. It is fairly inferable, however, that the agreement under which they were thus associated regarded the trade-marks which each party contributed to the several concerns as reverting to their original proprietor on the termination of the pool, as might lawfully be done without detriment to the trade-mark on the dissolution of a partnership. No deceit was practiced upon the public, as the origin and place of manufacture of the brands were truly stated and catalogued. In short, these business arrangements were mere temporary licenses or assignments of proprietary rights in the names, symbols, and patterns, of which no one could complain. But, were this otherwise, the lapse of time since the expiration of the associations referred to, and the adoption and undisputed use by plaintiff and its predecessors of the designs and names affixed to their wares, has sufficed to heal the infirmity, if any, which might otherwise have been charged against plaintiff’s title, even were plaintiff’s predecessors asking the relief here prayed, and, a fortiori, in favor of plaintiff, who is a stranger to the transactions urged against its exclusive right.
2. It is next argued as an equitable defense that defendants’ wares are of equal quality with the plaintiff’s. Many of the defendants’ affidavits are framed on the theory that the court will in this class of cases inquire into the comparative excellence of the merchandise of the parties. That issue is not material here. Where the infringer has, by the introduction, under simulated trade-marks, of greatly inferior articles, both deceived the public into their purchase and discredited the integrity and reputation of the proprietor of the trade-mark, the two considerations exist which impel courts to act at the instance of the injured party, viz., *437 the protection of the public against the fraud, and redress of the private wrong done the individual. But it is not essential to the latter’s relief that the deceit practiced should be actually injurious to the public. It is enough if his right has been infringed, and his business impaired, by the false colors of his competitor. McLean v. Fleming, 96 U. S. 252. In fact, a more permanent injury is inflicted upon the tradesmen whose goods are supplanted in the esteem of his customers by those of equal quality, offered under his trade-mark, and at lower prices; since the competition of an inferior article is likely to be ephemeral. In this view the excellence of the counterfeit intensifies the wrong done to the plaintiff, and is a cogent argument for his right to reparation, although the public have suffered no actual injury.
3. Was there any misrepresentation as to the manufacturer, or place of manufacture, of the scythestones for which the plaintiff asks protection, which ought to° bar the relief it seeks? The ground on which courts deny their aid to articles thus put forth is that a party who seeks equity must come with clean hands, and, if his case discloses fraud or deception, courts of equity will not interfere in his favor. Medicine Co. v. Wood, 108 U. S. 218, 225, 2 Sup. Ct. Rep. 436; Leather Cloth Co. v. American Leather Cloth Co., 11 H. L. Cas. 523; Fetridge v. Wells, 4 Abb. Pr. 144; Seabury v. Grosvenor, 14 Blatchf. 262. These cases, and numerous others in which the same doctrine is followed, proceed upon the ground that the complaining party, either in his trade-mark or in the business connected with it, has made material false statements to enhance the merit of his goods, by claiming for them an origin, ingredients, materials, or process of manufacture which they lack, and which, singly or together, commend them to public confidence, which is thereby betrayed. It is claimed that the case of the plaintiff is brought within the operation of this rule by its own and its predecessors’ circulars and catalogues, stating that the various patterns and brands of scythe-stones in controversy are made at, e. g., the “Willow Creek Quarry,” “Green Farm Quarry,” “Pt. Au Barques Quarry,” etc., and “from selected Huron grit,” “from the best blue Huron grit,” etc., whereas the stones of various names were made from the same quarries. The context in which these statements are found makes it plain that the quarries thus designated are located at Grindstone City,'Mich., and in some cases this is expressly stated. There is nothing to prevent plaintiff from thus nominally subdividing its properties at that place, or giving to these titular subdivisions such names as fancy may suggest. There is in such nomenclature no material false statement, nor is the public misled into the purchase of one class of goods instead of another. If the manufacturer chooses to associate one brand or trade-mark of his goods with a name arbitrarily given to a part of his works or quarries, no wrong is done to the public, so long as he furnishes the identical article demanded by the preference of his customers. The representation that the stones are made from “selected” or “the best blue Huron” grit are substantially satisfied if the quality of the materials used is not inferior to that which the trade have accepted as of that grade.
*438 The points of difference between the stones made and sold by plaintiff under the names of “Quinnebog,” “Western Red Ends,” “Star,” “Diamond,” “Clear Grit,” “Lake Huron,” mainly consist in patterns, size, and finish. The “Western Red Ends” are distinctly marked in the manner suggested by the name. The “Quinnebog” is characterized by a peculiar finish. The fact that all are made from the same quarries or rock formation is not evidence of a material false statement. The names are employed in accordance with business usage, to signify varieties of shape, size, etc., which have acquired a reputation with the trade, and to meet its demands. It is nowhere said that there is any difference in the characteristics or quality of the material from which the different patterns are made. The source whence this is derived, the place of its manufacture, and the maker’s name, are truly set forth, and, as the quality of the plaintiff’s goods is not questioned, no rule of equity or public policy is violated in allowing it to style its various manufactures by as many different appellations as may be necessary in their judgment to invite and secure markets for their merchandise, if in so doing no material false statement is made.
4. The close imitation of the plaintiff’s labels, patterns, and style evidenced by the exhibits of both parties and the catalogues and circulars issued to the trade, and the obvious damage to plaintiff’3 business from the methods employed by defendants, entitle plaintiff to relief on the ground of fraud, independently of the validity of the trade-marks in question: Lawrence Manufg Co v. Tennessee Manufg Co., 138 U. S. 537, 11 Sup. Ct. Rep. 402; Burton v. Stratton, 12 Fed. Rep. 696; White Lead Co. v. Cary, 25 Fed. Rep. 125; Baking Powder Co. v. Davis, 26 Fed. Rep. 293; Nail Co. v. Bennett, 43 Fed. Rep. 800; Societe Anonyme v. Western Distillery Co., 43 Fed. Rep. 416; Avery v. Meikle, 81 Ky. 73; Pierce v. Guittard, 68 Cal. 68, 8 Pac. Rep. 645; Fillery v. Fassett, 44 Mo. 173. The admitted facts, and the perfect correspondence of defendants’ labels in size, form, color, design, ornamentation, and phraseology, and in the names of the patterns, leave no doubt of defendants’ intention to make a market for their goods with the plaintiff’s customers by a close imitation of its trade-mark. The means employed were adopted to accomplish the purpose, and the plaintiff has suffered damages which it is the duty of the court ^o arrest and redress. The motion to dissolve the restraining order is denied, and a temporary injunction will issue according to the prayer of the bill.