**KENTUCKY FRIED CHICKEN CORPORATION, a Delaware corporation, Plaintiff,**

v.

**DIVERSIFIED PACKAGING CORPORATION, a Missouri corporation, and Diversified Container Corporation, a Missouri corporation, Defendants.**

No. 73-492-Civ-CF.

United States District Court,
S. D. Florida.

May 23, 1974.

William J. Dunaj of Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., Robert R. Feagin, III, of Holland & Knight, Tallahassee, Fla., for plaintiff.

Burton H. Shostak, St. Louis, Mo., Edward F. O'Herin, Malden, Mo., and Lloyd A. Palans, St. Louis, Mo., John L. Britton, Friedman, Britton & Stettin, Miami, Fla., for defendants; Kramer, Chused, Kramer, Shostak & Kohn, St. Louis, Mo., of counsel.

## MEMORANDUM OPINION

FULTON, Chief Judge.

This cause was tried before the Court, sitting without a jury, for five and one-half days. The Court having considered the evidence and the arguments and authorities relied upon by all parties, enters this Memorandum Opinion.

## NATURE OF THE ACTION

This action was brought by the Plaintiff, Kentucky Fried Chicken Corporation ("KFC Corp."), against the Defendant, Diversified Packaging Corporation ("Packaging") and Diversified Container Corporation ("Container"), for trademark infringement, unfair competition and tortious interference with the contractual relations between KFC Corp. and its franchisees. The Defendants in their Answer asserted affirmative defenses and counterclaims based upon allegations that KFC Corp. had violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act through various actions, including *inter alia*, the imposition of a tying arrangement upon its franchisees. KFC Corp. in its reply denied these allegations and, in addition, raised the affirmative defenses of justification the Defendants' lack of standing and KFC Corp.'s actions in good faith in adopting the arrangements in question under judicial supervision in a prior suit.

As the result of amendments to the pleadings and stipulations entered pursuant to extensive pre-trial proceedings, the issues were considerably narrowed. For its part, KFC Corp. abandoned its claim of tortious interference with contractual relations and withdrew its demand for damages, thereby limiting the relief it sought to an injunction and costs. The Defendants withdrew all their counterclaims and affirmative defenses with the exception only of the counterclaim asserted by Defendant Container seeking treble damages and an injunction for tying under Section 1 of the Sherman Act and the affirmative defense asserted by both Defendants based on misuse arising from the same allegations of tying.

The Court's jurisdiction over the claims and counterclaims that remained for trial is conferred by: 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) (as to Plaintiff's claims under the Lanham Act); 28 U.S.C. § 1338(b) (as to Plaintiff's claim of unfair competition); 15 U.S.C. §§ 15, 26 and 28 U.S.C. § 1337 (as to Defendant Container's anti-trust claim). In addition, complete diversity of citizenship exists between the parties and the amount in controversy exceeds $10,000, thereby giving the Court jurisdiction as to all claims under 28 U.S.C. § 1332.

## THE PARTIES AND THEIR RELATIONSHIPS

Plaintiff KFC Corp., a Delaware corporation with its principal place of business in Louisville, Kentucky, owns and operates fast-food restaurants throughout a large part of the United States, and it also franchises others to operate the same kind of restaurants in every state except Utah, Montana and Florida. These company-owned and franchised restaurants are unique in that their menus feature fried chicken prepared in accordance with a secret recipe originated by Colonel Harland Sanders, the founder of the business. By the early 1950's Colonel Sanders was selling and franchising others to sell chicken prepared according to this secret recipe to the public under trademarks and service marks now owned by Plaintiff KFC Corp., which included: "Kentucky Fried Chicken", "Colonel Sanders' Recipe", "Colonel Sanders' Recipe Kentucky Fried Chicken", a picture or drawing of the face of Colonel Sanders, and "it's finger lickin' good". Because of Plaintiff's extensive advertising and sales of products bearing the foregoing trademarks and service marks, such trademarks and service marks have become very well known to the American public.

In the operation of the Kentucky Fried Chicken chain of restaurants,

KFC Corp. requires its company-owned and franchised stores to use certain equipment, food ingredients, packaging materials and other products that meet standards and specifications established by KFC Corp. The products involved in this suit fall within this category. Although KFC Corp. has traditionally offered a large number of these products for sale to its franchisees and company-owned stores, at all times material to the claims in this case, KFC Corp. has permitted its franchisees to buy the products from other approved sources. In addition, pursuant to the settlement of a class action filed in the District Court for the Middle District of Florida (G & K Foods, Inc. v. KFC, Inc., et al., Case No. 71-5-Civ.-Ft.M.), KFC Corp. offered to all its franchisees amendments to their franchise contracts which, *inter alia*, clarified the right of the franchisees to buy direct from approved sources and established procedures for franchisees to obtain approval of additional suppliers with whom they wished to deal.

Defendant Packaging is a Missouri corporation and was incorporated on June 25, 1968. Pursuant to a proposal made by its president, Mr. Sanford Gubernick, Packaging entered into a business arrangement with KFC Corp. whereby Packaging wrapped and sealed napkins and "towelettes" (wet-naps) bearing the Plaintiff's trademarks and service marks and unmarked plastic eating utensils in a clear plastic wrapper. Packaging purchased the components, other than the plastic wrapping material, from KFC Corp. and resold the complete package as a "prepack" to KFC Corp. for sale by it to its franchisees and company-owned stores. KFC Corp. also continued to sell the plastic eating utensils, napkins and towelettes as separate items to its company-owned and franchised outlets. During the course of the foregoing relationship, Packaging also obtained KFC Corp.'s permission to supply to it plastic eating utensils that bore Plaintiff's trademarks and service marks. Packaging thereafter had these items produced for it by another concern and then sold the trademarked utensils to KFC Corp., both separately and in the "prepacks".

Packaging continued supplying these utensils and prepacks to KFC Corp. until KFC Corp. accepted offers from other companies to supply these products at lower prices. After some discussions between these parties, on August 9, 1972, Packaging and Mr. Gubernik executed a release in favor of Plaintiff in exchange for the receipt of $10,000. The parties have stipulated that this release bars any and all claims that Packaging or Mr. Gubernik might have had arising prior to the date of its execution. In the fall of 1972 Packaging ceased doing business, although the corporation has never been dissolved.

On August 24, 1972, Defendant Container was formed as a Missouri corporation by Sanford Gubernik and E. John Tamblyn, Jr., each of whom received 50% of its stock. Mr. Gubernik was also named president of this new corporation. Mr. Tamblyn was, at the time of Container's incorporation, the sales manager of Folding Cartons, Inc.—one of the four companies that manufacture automatic bottom folding cartons bearing KFC Corp.'s trademarks and service marks for resale by KFC Corp. to its company-owned and franchised outlets. Mr. Tamblyn participated in negotiating an agreement between his employer and Container whereby Folding Cartons, Inc. agreed (without its President's knowledge that Tamblyn was co-owner of Container) to sell to Container automatic bottom folding cartons in the dinner, snack and "crispy chicken" sizes bearing the Plaintiff's trademarks and service marks. Container thereafter purchased these cartons bearing the Plaintiff's trademarks and service marks from Folding Cartons, Inc. and commenced advertising and selling them to franchisees of the Plaintiff and others without the authorization or consent of the Plaintiff.

In the fall of 1972 Sanford Gubernik also formed and became president of a third Missouri corporation called Por-

**1140**

tion Control Corporation ("Portion") which began doing business in the same physical business premises as Container, utilizing some of the same employees as Container Portion manufactured towelettes bearing the Plaintiff's trademarks and service marks which were then advertised for sale and sold by Container along with the automatic bottom cartons bearing KFC Corp.'s trademarks and service marks. Neither Container nor Portion ever requested or received any authorization from the Plaintiff to manufacture, advertise or sell any products bearing the Plaintiff's trademarks or service marks.

### TRADEMARK INFRINGEMENT

The marks in suit, stipulated by the parties to be owned by the Plaintiff and duly registered in the United States Patent Office, consist of the following:

(a) "it's finger lickin' good"—registered as a trademark on November 5, 1963, Registration No. 759,775, and registered as a service mark on December 28, 1965 as Registration No. 801,095;

(b) "Colonel Sanders' Recipe"—registered as a trademark on September 6, 1966, as Registration No. 814,610, and registered as a service mark on March 15, 1966, as Registration No. 805,773;

(c) The portrait of Harland Sanders —registered as a trademark on July 5, 1966, as Registration No. 810,835, and registered as a service mark on March 22, 1966, as Registration No. 806,104;

(d) "Kentucky Fried Chicken"—registered as a trademark on November 14, 1967, as Registration No. 838,895, and registered as a service mark on September 13, 1966, as Registration No. 815,167;

(e) "Colonel Sanders' Recipe, Kentucky Fried Chicken"—registered as a trademark on August 23, 1966, as Registration No. 813,559, and registered as a service mark

on October 31, 1967, as Registration No. 838,062.

Each of the marks in suit is registered as a trademark in Class 46 for food products and as a service mark for restaurant services in Class 100, and, as the first user, the Plaintiff has established its common law rights to each of these trademarks and service marks. The Plaintiff uses these marks by applying them to each of the specific products in suit, i. e., dinner, snack and crispy chicken cartons, towelettes, napkins, plastic eating utensils and prepacks. The Defendants have also used Plaintiff's marks in the same way, namely by applying them to the products in suit.

The Defendants' theory regarding infringement and unfair competition is that the Plaintiff's trademarks and service marks are strictly confined to trademarks on food products and the preparation of food products and that the Plaintiff's rights do not extend to prevent the Defendants' use of the marks on the products in suit. The Plaintiff's contention is that its right to exclusivity in its trade and service marks is not limited to the chicken, but that it extends to the products in suit which are the containers and paper goods used to advertise and market the chicken and to render services relating thereto. Upon this issue, the Court agrees with the Plaintiff.

The only logical way in which Plaintiff can use its marks in the selling of its food products is on the packages and items furnished in connection with Plaintiff's marketing of those products. When a consumer purchases fried chicken, he buys the box as well as the contents. The chicken cannot be reasonably sold to the consumer without containers, and the trademarks and service marks cannot be placed directly upon the chicken, mashed potatoes, rolls, cole slaw, etc. Thus there is a close and intimate relationship between the food products and the paper products in suit.

The protection afforded a trademark owner is not limited to the

goods on which he is using his mark, but, rather, extends to any goods on which the use of the offending mark is likely to cause confusion. Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857, 361 (5th Cir. 1967); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 623 (5th Cir. 1963). Although the evidence has shown that the Plaintiff's products and the Defendants' products in suit are in direct competition, that fact is not essential to the conclusion reached here because confusion, not competition, is the controlling issue in an action for trademark infringement. 15 U.S.C. § 1114(1)(a); Continental Motors Corp. v. Continental Aviation Corp., *supra*, at 860; American Foods, Inc. v. Golden Flake, Inc., *supra*; Abramson v. Coro, Inc., 240 F.2d 854, 856 (5th Cir. 1957); Pure Foods, Inc. v. Minute Maid Corp., 214 F.2d 792, 795 (5th Cir. 1954). That confusion is likely under the facts of the present case is obvious from the similarities between Plaintiff's and Defendants' products in suit.

The products in suit include three sizes of automatic bottom folding cartons. The Plaintiff has these cartons manufactured to its specifications by four different manufacturers for sale by Plaintiff to its company-owned and franchised stores. The cartons are die cut from solid bleach sulfate board, glued at the factory and folded flat for shipping. Upon delivery to the retail stores, the cartons are designed so that they can be assembled by an employee with a single motion which sets up the cartons and locks the bottom in place. A ripco or waxed liner is then placed inside, and the lid is folded over. The three sizes of cartons involved in this action are known as "dinner" size, "snack" size, and "crispy chicken" size, each being designed to hold different amounts of chicken.

The Plaintiff has set forth in writing the specifications for the manufacture of the cartons, and one of the most important of these specifications is the thickness of the board from which the cartons are required to be made. The Plaintiff's dinner and cripsy chicken cartons are required to be manufactured from board .016″ thick, and the snack cartons are required to be made from .015″ thick board; but a tolerance of plus or minus .001″ is allowed for variances in thickness due to industry-wide tolerances for the manufacture of the board from which they are made. All three sizes of the Plaintiff's cartons display the Plaintiff's five trademarks and five service marks in suit. In addition, they contain the Plaintiff's trade or corporate name "KFC Corp.", and they display the red and white stripe trade dress widely used by the Plaintiff on its products, retail stores and in its advertisements.

Defendant Container sells cartons in the same three sizes as Plaintiff's cartons, and Defendant Container's cartons contain identical displays of the Plaintiff's red and white striped dress. Defendant's cartons also contain the Plaintiff's trade name "KFC Corp.", although Defendant's own name is not on its cartons. The principal distinguishing feature of the Defendant's cartons is that they are made of thinner cardboard than the Plaintiff's, the Defendant's snack cartons being made of .0135″ to .0137″ thick board.

The other products in suit are napkins, towelettes and plastic eating utensils. The Plaintiff sells several kinds of napkins, but the napkin involved in this suit is designed for use with "take-out" orders where the retail consumer may not have access to other napkins or towels. The Plaintiff's napkin contains its red and white striped trade dress and Plaintiff's five trademarks and five service marks in suit. The Plaintiff's napkin measures 17″ x 17″, and is manufactured from one-ply paper with a crepe finish which gives it increased cleansing properties. The Plaintiff sells these napkins separately and in prepacks, while the Defendants only sell napkins in prepacks. At one time the napkins sold by

Defendants were identical to the Plaintiff's napkins in all particulars, but the napkins presently being sold by the Defendants in prepacks are manufactured from paper without the crepe finish, and Defendants' napkins measure only 10″ x 12″.

The Plaintiff's towelette or "wetnap" is a wet napkin soaked in a solution of alcohol, water and other specified components and sealed in an airtight foil container so that the napkin remains wet. The Plaintiff's towelette bears the Plaintiff's red and white trade dress colors, its corporate name, and the Plaintiff's trademarks and service marks, "it's finger lickin' good", "Colonel Sanders' Recipe", "Kentucky Fried Chicken", and the face of Colonel Sanders. The Defendants' "towelette" is actually fabricated by Portion Control Corporation, but none of the Defendants nor Portion Control Corporation know the ingredients in the solution used in these wetnaps called "Towel Wets" because the solution is purchased from another company. Therefore, neither Defendants nor Portion Control Corporation know whether the ingredients in the Defendants' wetnap meet the Plaintiff's specifications for those products. The Defendants' towelettes bear the Plaintiff's trade dress colors and all of the same trademarks and service marks as the Plaintiff's towelettes. Some of the Defendants' towelettes contain the legend "manufactured by Diversified Packaging Corp."; others contain the legend "manufactured by Portion Control Corp."

The last product involved is a plastic eating utensil, sometimes called a "spork" because it combines the properties of a spoon and a fork. These plastic eating utensils are manufactured of white plastic for the Plaintiff in accordance with its specifications, and they have the impression of the face of Colonel Sanders and the Plaintiff's registered trademark and service mark "Kentucky Friend Chicken" moulded into the handle. The Defendants are presently selling sporks which do not bear the impression of Colonel Sanders' face or the Plaintiff's mark "Kentucky Fried Chicken" on them.

As previously stated, Defendant Container also sells a "prepack" which consists of the plastic eating utensil, napkin and wetnap wrapped together in a transparent plastic film. The "prepack" as such does not contain any trademarks or service marks separate from those on the components which are visible through the transparent wrapper.

In addition to the Defendants' use of the Plaintiff's registered marks on their products as described, the Defendants have used the Plaintiff's marks extensively in their advertising circulars, on their envelopes, and on the shipping cartons for their products.

■ The Defendants' extensive use of Plaintiff's marks has created a strong likelihood of confusion at two separate distribution levels. First, owners of Plaintiff's franchised stores are likely to believe that the Defendants' products come from or are authorized by the Plaintiff when they are not. In this regard, the evidence has shown that actual confusion at this level has already occurred, in that franchisees of the Plaintiff have responded to Defendants' advertisements and purchased the Defendants' products believing them to be coming from or authorized by the Plaintiff, and, based on this erroneous belief, dissatisfied purchasers of Defendants' products have complained to Plaintiff about their inferior quality. Second, members of the public who purchase food at the retail level from Plaintiff's franchisees or company-owned stores are likely to be confused into believing that the Defendants' cartons and other items accompanying the food are approved by the Plaintiff. The likelihood of confusion is further enhanced by the fact that the Defendants' cartons contain the Plaintiff's trade name without any indication that they were distributed by someone other than the Plaintiff. Addi-

tionally, Defendants' extensive uses of the Plaintiff's registered marks without Plaintiff's permission on goods of inferior quality clearly dilute the value of those marks. The Defendants admit these uses of the Plaintiff's marks are not authorized by the Plaintiff, and the Defendants have clearly used Plaintiff's registered marks in interstate commerce. Thus both Defendants have infringed the Plaintiff's registered marks, and the Plaintiff is entitled to a permanent injunction against them. 15 U.S.C. § 1114; World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482 (5th Cir. 1971); Continental Motors Corp. v. Continental Aviation Corp., supra, Mead Johnson & Co. v. Baby's Formula Service, Inc., 402 F.2d 19 (5th Cir. 1968).

Defendant Container's defensive argument summarized by them as "our box is their box" is no defense to a trademark infringement or unfair competition action. The evidence has clearly shown that the Defendants' products are inferior to the Plaintiff's products. But it would be no defense even if the Defendants' products were identical in quality or even superior to Plaintiff's. Cleveland Stone Co. v. Wallace, 52 F. 431 (E.D.Mich.1892); Maison Prunier v. Prunier's Restaurant & Cafe, Inc., 159 Misc. 551, 288 N.Y.S. 529 (N.Y.S. Ct.1936).

## UNFAIR COMPETITION

Unfair competition goes to the question of a defendant's methods of marketing his product, not to his right to produce an item. One may be perfectly within his legal rights in producing an item, and yet well without them in his method of selling it if he markets his item in such a way as to cause likely confusion as to the source of such products. Bunn Co. v. AAA Replacement Parts, 451 F.2d 1254, 1262–1263 (5th Cir. 1971); Goldwyn Pictures Corp. v. Goldwyn, 296 F. 391, 401 (2d Cir. 1924); Calimafde, Trademarks and Unfair Competition, 267. In a suit for

trademark infringement and unfair competition, even where a plaintiff's trademarks have not been infringed by the defendant's conduct, the court must consider the broader question of whether the defendant has met his additional burden to take reasonable steps to inform the prospective purchasers that the goods which he markets are not those of the other. Bunn Co. v. AAA Replacement Parts, supra; Chemical Corp. of America v. Anheuser Busch, Inc., 306 F.2d 433, 437–438 (5th Cir. 1962).

In the *Bunn* case, the Fifth Circuit Court of Appeals analyzed a claim of unfair competition by adding up the defendant's activities as "digits" to evaluate whether the challenged conduct constituted unfair competition. Utilizing this analysis, it is clear that the digits involved in the present case add up to unfair competition. These digits are as follows:

(1) The Defendants' cartons bear displays of the Plaintiff's trademarks, trade name and trade dress colors, but the Defendants' cartons do not have the Defendants' own name printed on them.

(2) The Defendants' advertisements are printed in Plaintiff's red and white striped trade dress and colors.

(3) The Defendants' envelopes for its advertisements and brochures are printed in Plaintiff's red and white striped trade dress and colors.

(4) The Defendants' envelopes and advertisements contain elaborate displays of the Plaintiff's trademarks on them.

(5) The Defendants' envelopes, advertisements and products do not contain any notice that the Defendants are not authorized by or a part of KFC Corp.

(6) The Defendants' advertisement which is Plaintiff's Exhibit 74 contains the statements "take ad-

vantage of your option to buy direct and save", "Save 50¢ per case on KFC boxes that meet exact specifications and quality of the boxes you are now buying", and "BUY DIRECT AND SAVE."

(7) Plaintiff's Exhibit 20A, also one of Defendants' advertisements, states: "Meets all standards."

(8) Plaintiff's Exhibit 52B, one of Defendants' advertisements, states: "Buy KFC boxes direct and save $1.00 more."

(9) Plaintiff's Exhibit 52C, one of the Defendants' envelopes, states: "Now buy direct and save $2.-00/M on KFC boxes."

(10) The Defendant's invoices, which are Plaintiff's Exhibit 54, describe the Defendants' products for which invoices are sent to purchasers as "KFC dinner boxes", and "KFC snack boxes.".

(11) The Defendants' food cartons are packed and shipped to purchasers in shipping cases that also bear the Plaintiff's trademarks and service marks.

(12) The shipping cases in which the Defendants' cartons are packed and shipped bear the part numbers, No. "6015002" and "6014002" on the outside. These part numbers are not exactly the same as Plaintiff's standard part numbers for cartons (including No. 6020041 and 6020051), but Defendants' part numbers are obviously very similar to those used by the Plaintiff. And the evidence has established that the Defendants do not use these part numbers in invoicing goods. Since the Defendants only sell a total of four products, their use of these seven-digit part numbers appears calculated to mislead.

(13) Defendants' employees, when asked during their telephone solicitations whether Container is one of Plaintiff's "approved suppliers" of cartons, avoid answering and represent to such potential customers that Container sells "approved boxes."

(14) As an additional "digit" in this analysis, the Court finds that Samuel Alpert, president of Folding Cartons, Inc., E. John Tamblyn, Jr., sales manager for Folding Cartons, Inc. and one-half owner of Container, and Sanford Gubernik, president and one-half owner of Container combined and contrived to deceive the Plaintiff as to their association and purposes. The purposes included the omission of Folding Cartons, Inc.'s name or mark from the cartons it manufactured and sold to Defendant Container in order to make it difficult or impossible for the Plaintiff to learn the identity of the manufacturer of the cartons that were being sold by Container. This association resulted in profit to Folding Cartons, Inc. and Container by virtue of their utilization of thinner and cheaper board which did not meet Plaintiff's specifications in their cartons, a fact concealed from Plaintiff. The Court finds that Samuel Alpert, acting for Folding Cartons, Inc., deliberately sold cartons manufactured from thinner board to Container knowing that those cartons did not meet the Plaintiff's thickness specifications. The Court further finds that cartons manufactured from this thinner board were provided by Folding Cartons, Inc. to Container and that Container put these goods into commerce bearing the plaintiff's trademarks both before and after Plaintiff learned of the thinner board's utilization and rejected its use.

After Plaintiff confronted Samuel Alpert with Folding Carton's use of this thinner board, he admitted that he had

deliberately manufactured cartons out of board that he knew did not meet Plaintiff's specifications and that he had supplied both Plaintiff and Defendants with cartons which he knew were below Plaintiff's specifications. On the witness stand, Alpert admitted that he had deceived the Plaintiff and kept this information from it by "selecting samples" for the Plaintiff which he knew were not representative in response to the Plaintiff's periodic requests that samples be sent to it for testing. Mr. Alpert attempted to justify this conduct as a part of the mores of the business world and by stating that he felt his thinner cartons were equal to cartons made from the thicker board required by the Plaintiff's specifications. However, after the Plaintiff became aware of the use of the thinner board and rejected the use of those cartons, Mr. Alpert offered to go back to the specification board that the Plaintiff required.

Mr. Alpert also lied to the Plaintiff when asked if he was selling cartons bearing Plaintiff's trademarks to Defendants. To facilitate his deception, Alpert, with the consent of Defendants, removed the "bug" or manufacturer's identification mark from the folding cartons which he sold to Defendants. Because of this, the Plaintiff was unable for some time to trace the source of the substandard cartons bearing its trademarks which were being sold by Defendant Container.

The Court finds that this sort of subterfuge and deception can hardly be considered fair dealing in the context of this case and must obviously constitute unfair competition. The Court further finds that Sanford Gubernik was not only aware of these things but also that his association with Mr. Alpert through Mr. Tamblyn, who owned half of the stock of Defendant Container and was in effect Gubernik's business partner, placed Gubernik in a position where he had knowledge of and consented to Alpert's actions, even though he may not have actively participated therein.

In addition, the evidence in the present case, some of which is overlapping with the evidence previously discussed as digits relating to this Court's judgment of unfair competition, shows that the Defendants have also violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That section created a new federal cause of action against "any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce." Such a cause of action is created in favor of "any person who believes that he is or is likely to be damaged by use of such false description or representation." 15 U.S.C. § 1125(a); Alum-A-Fold Shutter Corp. v. Folding Shutter Corp., 441 F.2d 556 (5th Cir. 1971).

Section 43(a) of the Lanham Act prohibits not only a "false designation of origin" but also "any false description or representation" in connection with any goods. Electronics Corp. of America v. Honeywell, Inc., 358 F.Supp. 1230–1233 (D.C.Mass.1973), aff'd., 487 F.2d 513 (1st Cir. 1973); Potato Chip Institute v. General Mills, Inc., 333 F.Supp. 173 (D.C.Neb.1971).

The Court finds that the statements utilized in a number of the Defendants' advertisements soliciting customers to "buy KFC boxes direct and save" and "buy direct and save $2.00/M on KFC boxes," "buy direct and save," etc., are misrepresentations no matter how such phrases are construed. The phrases represent either that the prospective customer would be purchasing the boxes "direct" from the manufacturer of the boxes when, in fact, Container is not the manufacturer, or they represent that the prospective purchaser would be buying the boxes "direct" from KFC Corp. when, in fact, they are not. Additionally, the Defendants' advertisements mis-

represent and falsely describe the Defendants' products stating "our KFC boxes meet quality standards," "meets all standards," and "save 50¢ per case on KFC boxes that meet exact specifications and quality of the boxes you are now buying," etc. This conduct violates Section 43(a) of the Lanham Act and it has damaged the Plaintiff, entitling the Plaintiff to injunctive relief. The Court, therefore, finds that Defendant Container is guilty of unfair competition upon the additional basis of its violation of the Lanham Act, Section 43(a).

The Defendants' only affirmative defense was based upon allegations that the Plaintiff had misused its trademarks in a tying arrangement in violation of the antitrust laws of the United States. For the reasons expressed below, the Court finds that the Defendants have failed to prove this defense.

## ANTITRUST ISSUES

The defendants originally counterclaimed against KFC Corp. for violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. In the course of the pre-trial proceedings, Defendant Packaging withdrew all its counterclaims and Defendant Container withdrew the claims based on Section 2 of the Sherman Act and Section 3 of the Clayton Act.

The only part of the counterclaim that remained for trial was Container's claim for violation of Section 1 of the Sherman Act which was based on allegations that KFC Corp. imposed an illegal "tying" arrangement on its franchisees by requiring them to purchase cartons bearing the KFC trademarks only from KFC or its designated suppliers as a condition of receiving the rights granted under the franchise agreement.

The franchise agreements between KFC Corp. and its franchisees upon which Defendant Container relied, in part, to attempt to show the alleged illegal tying scheme included the following relevant provisions:

"FRANCHISEE shall acquire from FRANCHISOR or from sources approved by FRANCHISOR in writing, which approval shall not be unreasonably withheld, the supplies, materials, equipment and other items specified in the Confidential Operating Manual furnished by FRANCHISOR under Section VI. H hereof which, through FRANCHISOR's experience, are the minimum essential to the preservation of FRANCHISOR's trademarks and will reasonably insure a consistent quality and maintain national uniformity of products as required by FRANCHISOR's system."

"FRANCHISEE shall have the right to purchase directly from any approved source the equipment, paper goods and other products required by FRANCHISOR to be utilized in the establishment or operation of FRANCHISEE's outlet. FRANCHISOR shall promptly . . . furnish to FRANCHISEE at his request the then current standards and specifications applicable to any equipment, supplies, trademarked paper goods or other products required by FRANCHISOR to be utilized in the establishment or operation of an outlet. . . . In addition, FRANCHISOR shall promptly . . . furnish to FRANCHISEE at his request the names and addresses of all manufacturers and suppliers currently approved by FRANCHISOR from whom such equipment, supplies, trademarked paper goods and other products are available for sale to FRANCHISEE. . . . FRANCHISOR shall not be arbitrary or capricious in establishing applicable standards and specifications. If FRANCHISEE desires to purchase the required products from a manufacturer or supplier not then approved by FRANCHISOR, FRANCHISEE shall provide FRANCHISOR with all information regarding such manufacturer or supplier reasonably requested by FRANCHISOR, and, where appropriate, the manufacturer

or supplier may be required to provide FRANCHISOR with samples of products that FRANCHISEE desires to purchase. . . . On the completion of any tests and any other procedures reasonably required by FRANCHISOR, and on completion of FRANCHISOR's determination as to whether the manufacturer or supplier possesses adequate capacity and facilities to supply the FRANCHISEE's needs in the quantities, at the times and with the reliability requisite to an efficient operation, FRANCHISOR shall promptly notify FRANCHISEE and the manufacturer or supplier whether FRANCHISOR approves the manufacturer or supplier as a source of supply of the product involved to FRANCHISEE; and, if not, FRANCHISOR shall advise FRANCHISEE and the manufacturer or supplier of the basis for its decision. . . . "

"FRANCHISOR hereby contractually agrees to continue in effect and to strictly enforce its policy against accepting any payment or anything of value from any person with whom FRANCHISEE does business by reason of, or based on sales by, any such person directly to FRANCHISEE."

Initially, Defendant Container took the position that the foregoing franchise provisions, on their face, were tying agreements that constituted *per se* violations of the federal antitrust laws. After briefs were filed by both sides and a hearing was held on this issue, Container stipulated that the agreements themselves did not establish a *per se* violation and asserted that a tying arrangement would be established by the totality of the evidence relevant to the claim, including conduct by KFC Corp. in enforcing the franchise agreements.

■■■ In order to prove an illegal tying arrangement through a *course of conduct*, the complaining party must demonstrate that the "tyor" imposed a tie through coercion and not by mere persuasion. American Mfrs. Mutual Ins. Co. v. ABC-Paramount Theatres,

446 F.2d 1131 (2d Cir. 1971); Abercrombie v. Lum's, Inc., 345 F.Supp. 387 (S.D.Fla.1972); Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970); Lee Natl. Corp. v. Atlantic Richfield Co., 308 F. Supp. 1041 (E.D.Pa.1970). With respect to this point, Container traveled upon the theory that "power corrupts and absolute power corrupts absolutely." However, the fact that a franchisor possesses economic power over its franchisees is not enough; it must be shown that the franchisor actually employed this power in a coercive manner to force franchisees to purchase the tied product from the franchisor or from a designated supplier from whom the franchisor received some economic benefit as the result of the supplier's sales. Ford Motor Co. v. United States, 335 U.S. 303, 69 S.Ct. 93, 93 L.Ed. 24 (1948); Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir. 1972); N.W. Controls v. Outboard Marine Corp., 333 F.Supp. 493 (D.Del. 1971).

■■■ In this case, no evidence was presented by Container that established or supported in any way a claim that KFC Corp. imposed a tying arrangement upon its franchisees through a coercive course of conduct. Quite to the contrary, the totality of the evidence demonstrates, and the Court finds:

(1) That the previously quoted provisions of KFC Corp.'s franchise agreements permit the franchisees to purchase products meeting KFC Corp.'s standards and specifications from suppliers of their choice, subject only to the reasonable approval by KFC Corp. of the supplier;

(2) That quality control of products used or sold by franchisees of KFC Corp. is both proper and essential to the operation of the Kentucky Fried Chicken franchise system and to the protection of KFC Corp.'s trademarks and service marks;

(3) That the provisions of the franchise agreements pertaining to

the approval of suppliers are reasonable for the purposes of maintaining quality control; and

(4) Finally, that KFC Corp. has not applied or enforced these provisions in an unreasonable or coercive way to force a tying arrangement upon its franchisees.

Defendant Container made no claim in its pleadings or at trial that KFC Corp. had unreasonably denied it approval as a supplier. In fact, the evidence clearly shows that neither Container, nor any franchisee on behalf of Container, ever applied to KFC Corp. for such approval. KFC Corp. had, however, approved other suppliers of these same cartons at the request of franchisees who wished to purchase from them, demonstrating the ability of the franchisees to deal with suppliers of their choice, subject only to the reasonable approval of KFC Corp. According to uncontroverted testimony, KFC Corp. has never denied any franchisee's request to approve a new supplier.

Officers of KFC Corp., including the Director of Purchasing, the Director of Franchising and the Director of Field Services, appeared as witnesses and testified that KFC Corp. had not taken or threatened to take any action, such as cancellation of a franchise or denial of renewal or new store option rights, against a franchisee to force that franchisee to purchase products from KFC Corp. or from some designated supplier. In this regard, the Director of Field Services, Mr. William Evans, testified that the KFC field representatives who inspect franchisees' stores do not check the source or supplier of products used by the franchisees but check to see if the franchisees are complying generally with KFC standards in a wide variety of areas. The field representative is not able to and does not perform a detailed quality control inspection of these products. And, of course, by the time a field representative discovered a substandard product in a franchisee's store, it could be too late to prevent damage to the KFC image and loss to the franchisee. For these reasons, the primary efforts by KFC Corp. in controlling product quality consist of product testing done at the manufacturing and distribution levels *before* the product is delivered to the franchisee.

The total absence of coercive conduct on the part of KFC Corp. in enforcing its quality control procedures was corroborated by the testimony of two KFC franchisees, Mr. Virgil Meisenheimer and Mr. Tom Mullins, both of whom had purchased products from Container under the belief that Container was an approved supplier, and both of whom were dissatisfied with the quality of Container's products they received. The franchisees' testimony in this latter regard points up the necessity for KFC to exercise quality control at the distributor level through its supplier approval procedures, even where, as here, the distributor purchases the products it resells from a manufacturer that has been approved by KFC Corp. Quality control applied at the manufacturing level was obviously not sufficient to protect KFC Corp.'s legitimate interests in this situation where Samuel Alpert, President of the manufacturer, Folding Cartons, Inc., testified that he had tried to conceal from KFC Corp. the fact that he was selling cartons to Container and further testified that he had sold and would continue to sell cartons to Container that he knew did not meet KFC Corp.'s standards and specifications.

Container attempted to prove that KFC Corp. was not truly concerned with the quality of the products and services offered by the franchisees by showing that KFC Corp. did not exercise quality control over Kentucky Fried Chicken stores in Florida, Utah and Montana. This fact has absolutely no bearing on the antitrust issues in this case because KFC Corp., as the result of conveyances made by Colonel Sanders many years ago, does not own the trademarks in these states and does not license or have control over the Kentucky Fried Chicken franchised outlets located there.

Also, Container introduced price lists published by KFC Corp. covering all the products that it offered for sale to its franchisees. The fact that these price lists named only the carton suppliers from whom KFC Corp. purchased for resale and did not name the additional approved suppliers who sold only to franchisees on a direct basis is totally inconsequential. These price lists identified the products sold by KFC Corp. and in the case of some products, the manufacturers of those products. There was no reason to list manufacturers who did not manufacture the products offered by KFC Corp. Nor was there any evidence that KFC Corp. had ever refused to furnish the names of all approved suppliers of any particular product to a franchisee at its request.

Considering the totality of the evidence, Container has failed to prove that KFC Corp. imposed a tying arrangement upon its franchisees in violation of Section 1 of the Sherman Act. Accordingly, judgment shall be entered for KFC Corp. and against Container on the counterclaim.[1]

## CONCLUSION

The Court, therefore, finds that both Defendants have infringed the Plaintiff's trademarks entitling the Plaintiff to a permanent injunction against them, and the Court finds that the Defendant Container has unfairly competed with the Plaintiff, entitling the Plaintiff to a permanent injunction against Container on that basis as well. Because the evidence has shown that the Plaintiff owns the trademarks in suit in every state except the states of Florida, Montana and Utah, the injunction entered herein shall extend to all states except Florida, Montana and Utah. Plaintiff's counsel shall

1. The Findings and Conclusions set forth hereinabove are not based upon findings with respect to the credibility of witnesses. However, with respect to the subject of credibility, the Court feels constrained to state that it has no confidence in the integrity and credibility of Samuel Alpert, President of Folding Cartons, Inc., who appeared

submit a final judgment in accordance with the provisions of this Memorandum Opinion. The Plaintiff shall be entitled to recover its costs to be taxed against the Defendants herein.

as a witness in this cause. And the manner in which Mr. Sanford Gubernik fended and parried questions that were put to him as a live witness, but more particularly in his deposition, indicated to the Court that as a witness he was less than completely forthright and candid.